WOBURN GOLF AND SKI AUTHORITY & another *vs.*
WOBURN COUNTRY CLUB, INC. & others
(and two companion cases[1]).

Middlesex.    May 13, 1974. — June 11, 1974.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Woburn Golf and Ski Authority. Landlord and Tenant*, Validity of lease. *Municipal Corporations*, Lease of property, Tax title property. *Moot Question.*

A three year lease of property comprising a golf course and a ski area to a local country club, executed on behalf of the city of Woburn by its then mayor and tax title custodian after the enactment of St. 1968, c. 526, creating a golf and ski authority and providing for conveyance of the property to it, and only two weeks before such conveyance, was invalid where the lease would result in frustrating the purpose of St. 1968, c. 526, and where in view of the existence of the authority and the expectation that a conveyance would be made to it, a

---

[1] The companion cases are Woburn Golf and Ski Authority & another *vs.* Woburn Country Club, Inc., and Woburn Country Club, Inc. *vs.* City of Woburn & another.

determination by the custodian pursuant to G. L. c. 60, § 77B, that a "sale" was not immediately practicable, thereby authorizing the lease, was erroneous as matter of law. [416-420]

TWO BILLS IN EQUITY filed in the Superior Court on July 14, 1972, and November 19, 1972.

SUMMARY PROCESS. Writ in the Fourth District Court of Eastern Middlesex dated October 19, 1972.

On transfer of the summary process action to the Superior Court, the three cases were heard by *Mitchell*, J.

*Alexander E. Finger* (*John J. Fitzpatrick* with him) for Woburn Country Club, Inc. & others.

*John A. Johnson* for Woburn Golf and Ski Authority & another.

KAPLAN, J.  Woburn Golf and Ski Authority (Authority) and the city of Woburn (City) contend that a certain lease, executed on behalf of the City by the then mayor and by the then tax title custodian, and naming Woburn Country Club, Inc. (Club), as lessee, was invalid as violating statutory requirements. A judge of the Superior Court upheld this contention. We agree.

On consolidated trial of three cases, described below, the main facts appeared without substantial contradiction, the evidence being reported. Properties aggregating about 106 acres, comprising a golf course with appurtenances, and a ski area, were acquired by the City in the 1930's on foreclosure for failure to pay taxes. Thereafter the golf course was operated for various periods under leases from the City, including lease to the Club (a nonprofit corporation organized in 1966 under G. L. c. 180). In the mid-1960's a new plan emerged, to create a public "authority" to take over the properties and operate them. Accordingly, the City petitioned for appropriate legislation, and this was forthcoming in St. 1968, c. 526, which required and received acceptance by referendum of the voters of Woburn.[2] There were discussions between city officials and officers of the Authority about the time and mode of conveyance of

---

[2] Statute 1968, c. 526, was amended in particulars by St. 1971, c. 822, approved October 1, 1971.

the properties to the Authority. Finally, by deed dated January 15, 1971, reciting $1 and other valuable consideration, the mayor and the custodian on behalf of the City conveyed the properties to the Authority as they were authorized to do by § 1 of c. 526.[3] But only two weeks before, on December 31, 1970, the custodian with approval of the mayor, both purporting to act for the City, had leased the golf course to the Club for a period of three years, from January 1, 1971, to December 31, 1973.[4] The deed to the Authority stated that it was subject to the lease. In making the lease the two City officials relied on G. L. c. 60, § 77B.

Section 77B[5] states that the mayor of any city or the selectmen of any town which holds property acquired by

---

[3] Section 1 read as follows: "The Authority created by section two is hereby authorized to acquire by purchase or otherwise from the mayor and tax title custodian of the city of Woburn, and said mayor and tax title custodian are hereby authorized to convey to the Authority, the real and personal property known as the Woburn Country Club, consisting of ninety-six acres, more or less, with the buildings thereon, and also ten acres, more or less, on the northeast slope of Horn Pond Mountain, together with the ski equipment and buildings thereon. The Authority may establish, maintain and operate a ski business and golf club thereon."

The last sentence quoted was amended by § 1 of the 1971 amendatory statute to read: "The Authority shall establish, maintain and operate a public ski area and golf course thereon."

[4] The terms of office of the mayor and the custodian (who was also the city solicitor) ended on December 31, 1971. Evidently the mayor became a member of the board of directors of the Club in January, 1972, and later its president. The custodian also served for a time as a member of the board of directors of the Club.

[5] Section 77B reads in part: "The mayor of any city or the selectmen of any town which holds property acquired by foreclosure of tax titles or acquired under section eighty may appoint a custodian who shall have the care, custody, management and control of all property heretofore or hereafter so acquired by said city or town. . . .

"The custodian, acting on behalf of the city or town, may, notwithstanding any provision of law, ordinance or by-law inconsistent herewith, sell at public auction any such property, first sending a notice thereof as herein provided to the owner of record immediately prior to the acquisition by the city or town of the title to such property. . . . This section shall not be construed to prevent a city or town from disposing of such property under section three of chapter forty, or in any other manner authorized by law.

"If the custodian is of the opinion that a sale of any such property is not immediately practicable, the custodian, acting on behalf of the city or town, may, subject to the approval of the mayor or the selectmen, notwithstanding any provision of law, ordinance or by-law inconsistent herewith, lease such property for a term not exceeding three years, and may on behalf of the city or town execute and deliver such lease. . . ."

tax foreclosure may appoint a custodian to manage the property; that the custodian may sell the property at public auction (with certain required formalïties), but this statute is not to be construed to prevent a city or town from disposing of the property under G. L. c. 40, § 3 (which makes provision for nonpublic sale or lease),[6] or in any other manner authorized by law; and that if the custodian is of the opinion that a sale of the property is "not immediately practicable," he may on behalf of the city or town, subject to the approval of the mayor or selectmen, lease the property for a term not exceeding three years.

The lease to the Club dated December 31, 1970, recited the opinion of the custodian, with approval of the mayor, that sale of the property was not immediately practicable. However, the judge below believed § 77B to be irrelevant because the provision as a whole is directed, so he thought, to tax properties for which public auction could be appropriate; but here, as all appear to agree, the statute creating the Authority contemplated a conveyance by the City to the Authority and no one else, and was inconsistent with a public auction. According to the judge, the remaining source of power for the City's leasing the golf course was G. L. c. 40, § 3, but that statute by its terms requires authorization from the governing body of the City, which was not obtained.[7]

The judge's reading is plausible. An alternative reading appears preferable. Section 77B refers not only to sale by public auction but to disposition (which includes sale) under G. L. c. 40, § 3, or other law; so § 77B need not be

---

[6] Section 3 reads in part: "A town may hold real estate for the public use of the inhabitants and may convey the same by a deed of its selectmen thereto duly authorized, or by a deed of a committee or agent thereto duly authorized . . . and may make such orders as it may deem necessary or expedient for the disposal or use of its corporate property. . . ."

The last quoted clause includes a power to lease. See *Ballantine* v. *Falmouth*, 363 Mass. 760, 766-767 (1973).

[7] See n. 6 above. While § 3 speaks only of towns, it applies also to cities, with corresponding enlargement of the meaning of selectmen to include the governing body of a city. See G. L. c. 4, § 7, Thirty-fourth; c. 40, § 1; c. 41, § 3.

thought of as directed as a whole to tax properties appropriate for public auction. (It is noteworthy that where § 77B speaks of the impracticability of a "sale," the term is not modified by any reference to sale at public auction.) In this view, § 77B remains relevant to the transaction at bar, and the lease to the Club is rendered invalid. For, considering the existence of the Authority and the expectation on all hands that a conveyance would be made to it, and considering further that the expectation was actually realized nearly simultaneously with the making of the lease, we think a determination by the custodian that a sale (in particular a conveyance to the Authority for nominal consideration) was not then immediately practicable, and that the golf course should be leased for three years, was untenable and erroneous as matter of law. As the judge stated in his findings, "No event changed the practicability of the sale of the subject property between December 31, 1970, and January 15, 1971."

Another alternative interpretation is to reason that the very statute establishing the Authority cuts across the other statutes mentioned and must itself be read as rendering illegal the lease executed just before the conveyance to the Authority. The effect of the particular transaction by the two City officials must, as a practical matter, be to tie the hands of the Authority and stultify it for the period of the lease, a result incompatible with the evident legislative purpose to vest operating power and responsibility in the Authority from the time the properties were conveyed to it. Cf. *Duggan* v. *Taunton*, 360 Mass. 644 (1971).[8]

As all roads thus lead to invalidation of the lease, the Authority and the City deserve to succeed in the three matters consolidated for trial. The first suit was by the Authority and the City (joined as a party on motion)

---

[8] It is unnecessary to enter into the question of the applicability of the Revised Ordinances of the City of Woburn (1966), c. XV, §§ 3, 5 (c), requiring the mayor to obtain a majority vote of the City Council in respect to conveyances and leases as there described.

against the Club and the former mayor and custodian to declare the lease invalid and for an accounting: the final decree declaring in favor of the plaintiffs, and an interlocutory decree overruling the defendants' demurrer to the amended bill, are to be affirmed. Second was a writ of summary process by the Authority and the City against the Club for possession in which a finding was made for the plaintiffs: the defendant's exceptions are to be overruled.[9] Third was a suit by the Club against the City and the Authority to restrain the summary process: the final decree dismissing the bill is to be affirmed.

The briefs discuss the question whether the entire controversy has not become moot pending appeal because, although the stated term of the lease was still running when decision was rendered below, it had expired before argument in our court. Dismissal for mootness, however, would mean that the time and effort expended by the parties and the courts would be thrown away, since the decision below would then carry no weight as a former adjudication. *Reilly* v. *School Comm. of Boston*, 362 Mass. 689, 696 and n. 6 (1972). *Jenkins* v. *Guardianship Admr., Ill. Dept. of Children & Family Servs.* 364 Mass. 835 (1974). As it is represented to us that there may be further litigation between the parties to which the adjudication may be pertinent,[10] and as the litigation apparently would center on the fixed past transaction here discussed and would not

---

[9] The summary process appears to have been commenced in immediate response to a withdrawal of the Club's liquor license by the Alcholic Beverages Control Commission. See G. L. c. 139, § 19. Withdrawal was grounded on a finding that the Club did not qualify as a licensee because of the failure to hold membership meetings to elect the board of directors or officers, see G. L. c. 138, § 1 (definition of "club"); also mentioned was service of liquor to persons not members of the Club, § 12. These questions were not pursued by the judge in view of the adoption of the broader ground for invalidating the lease; for the same reason the judge did not have to examine the suggestion that so much, at least, of the lease was invalid as relieved the Club from liability for local real estate taxes. See G. L. c. 59, § 3A.

[10] On the face of the record it appears that an accounting may still be required although the Club asserts that receipts above expenses were used for improvements.

involve inchoate future events, compare the *Reilly* case, *supra*, at 693-695, we decide the controversy on the merits.

*In the first case, interlocutory and final decrees affirmed; second case, exceptions overruled; third case, final decree affirmed.*